# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2020-NMCA-023

Filing Date: October 29, 2019

NO. A-1-CA-35613

IN THE MATTER OF THE GUARDIANSHIP
AND CONSERVATORSHIP OF C.G.,

ROBERT RICHARDS,

      Appellant,

v.

MICHAEL MCEACHERN,

      Appellee.

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY**
**Gerald E. Baca, District Judge**

Released for Publication June 2, 2020.

Robert Richards
Santa Fe, NM

Pro Se Appellant

Hurley Toevs Styles Hamblin & Panter PA
Gregory W. MacKenzie
Lalita Devarakonda
Albuquerque, NM

for Appellee

Disability Rights New Mexico
Alice Liu Cook
Jason C. Gordon
Albuquerque, NM

for Amicus Curiae Disability Rights New Mexico

## OPINION

**VANZI, Judge.**

{1}     Attorney Robert Richards appeals from the district court's order striking his entry of appearance "as counsel of record for [C.G.]," an adult under a guardianship and conservatorship ordered by the court pursuant to Article 5 of the New Mexico Uniform Probate Code (UPC), "Protection of Persons Under Disability and Their Property," NMSA 1978, §§ 45-5-101 to -436 (1975, as amended through 2019[1]) (Article 5). We reverse.

**Background**

{2}     The substantive question presented arose in circumstances that court-appointed professionals in the case described as "difficult" and "complicated," with concerns expressed about C.G.'s relationships with family members and their involvement in decisions within the authority of C.G.'s court-appointed guardian and conservator; differences between what family members believed C.G. needed and what C.G. said she wanted, which the guardian believed should be supported; and issues in the relationship between C.G.'s guardian and conservator. Inconsistencies in the terms of the order and documents implementing the guardianship and conservatorship interposed confusion, and other circumstances precipitated delays and litigation concerning various issues. While the record sheds light on the context in which this appeal arises, we are mindful of the sequestered nature of the proceedings below and that the sole substantive question before us is whether the district court erred in striking Richards' entry of appearance as counsel for C.G. on the grounds stated in its order.

**A.     Appointment of Guardian and Conservator**

{3}     In June 2014 C.G.'s daughter (Daughter)[2] filed a petition in the district court asking to be appointed as guardian and conservator for her mother. Acting in accordance with statutory procedures stated in Article 5, the court entered orders appointing a qualified healthcare professional (QHCP),[3] a visitor,[4] and a guardian ad litem (GAL),[5] and scheduling an evidentiary hearing to determine whether C.G. was

---

[1]Some statutes pertinent to the substantive issue presented in this appeal have been amended, with effective dates following entry of the order from which Richards appeals. We cite and apply the statutes in effect during the relevant time period, which predates those amendments.

[2]C.G. has more than one daughter. The daughter referred to herein as "Daughter" filed documents and participated in the proceedings below.

[3]*See* NMSA 1978, § 45-5-101(U) (2011, amended 2019) (defining "qualified healthcare professional" as "a physician, psychologist, physician assistant, nurse practitioner or other health care practitioner whose training and expertise aid in the assessment of functional impairment").

[4]*See* § 45-5-101(V) (defining "visitor" as "a person who is an appointee of the court who has no personal interest in the proceeding and who has been trained or has the expertise to appropriately evaluate the needs of the person who is allegedly incapacitated").

[5]*See* § 45-5-101(E) (stating that " 'guardian ad litem' has the same meaning as set forth in [NMSA 1978,] Section 45-1-201[(A)(22) (2011)]); NMSA 1978, § 45-1-201(A)(22) (stating that, "[a]s used in the [UPC], except as provided in Subsection B of this section and unless the context otherwise requires . . . 'guardian ad litem' means a person appointed by the district court to represent and protect the interests of a minor or an incapacitated person in

incapacitated.[6] *See* NMSA 1978, § 45-5-303 (2009, amended 2019) (stating guardianship procedures); NMSA 1978, § 45-5-407 (1998, amended 2019) (stating conservatorship procedures); § 45-5-102(D) ("When both guardianship and protective proceedings[7] as to the same person are commenced or pending in the same court, the proceedings may be consolidated."). The court also granted Daughter's emergency ex parte motion, in which she asked to be appointed as temporary guardian and temporary conservator. *See* § 45-5-310 (governing appointment of temporary guardian); § 45-5-408 (governing appointment of temporary conservator).

**{4}** On September 30, 2014, after holding a hearing, the court entered an "Order Appointing Temporary Guardian and Conservator" (2014 Order), in which the court concluded, among other things, that C.G. "is incapacitated and appointment of a guardian and conservator is necessary"; the guardian and conservator "should each be appointed to serve with independent and several authority"; and C.G. had the right to appeal the appointments within thirty days "and to seek alteration or termination of the guardianship and/or conservatorship at any time." The 2014 Order's decretal paragraphs "ordered, adjudged and decreed"[8] the following (among other things): (1) C.G. is "declared an incapacitated person"; (2) an independent guardian (identified by name) is appointed as "plenary guardian of [C.G.]" (Guardian); (3) C.G.'s son-in-law (also identified by name) is appointed as "conservator of the estate[9] of [C.G.]" (Conservator); (4) "Letters of Guardianship and Conservatorship shall issue upon acceptance of this appointment"; and (5) the duties of the GAL appointed at the commencement of the proceedings "are terminated upon entry of this order." *See* § 45-5-304 (describing inquiries and findings to be made in appointing guardians); § 45-5-407(G)-(P) (same in appointing conservators); § 45-5-303.1(B) (stating that, "[u]nless otherwise ordered by the court," GAL duties "terminate and the [GAL] is discharged from" those duties "upon entry of the order appointing the guardian and acceptance of the appointment by the guardian"); § 45-5-404.1(B) (same in conservatorship proceedings).

---

connection with litigation or any other court proceeding"); § 45-1-201(B) (stating that "[t]he definitions in Subsection A of this section are made subject to additional definitions contained in subsequent articles that are applicable to specific articles, parts or sections"); NMSA 1978, § 45-5-303.1 (1993, amended 2019) (stating the duties of a GAL); NMSA 1978, § 45-5-404.1 (1993, amended 2019) (same in conservatorship proceedings).

6Section 45-5-101(F) defines "incapacitated person" as "any person who demonstrates over time either partial or complete functional impairment by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication or other cause, except minority, to the extent that the person is unable to manage the person's personal affairs or the person is unable to manage the person's estate or financial affairs or both." Section 45-5-101(T) defines "protected person" as "a minor or other person for whom a guardian or conservator has been appointed or other protective order has been made[.]" We generally use "incapacitated person" here because the court's determination that C.G. needed a guardian and conservator rests on a finding of incapacity.

7 Section 45-5-101(S) defines "protective proceeding" as "a conservatorship proceeding under Section 45-5-401."

8*See, e.g., Khalsa v. Levinson*, 1998-NMCA-110, ¶ 13, 125 N.M. 680, 964 P.2d 844 (explaining that "decretal language . . . carries the decision into effect by ordering that something happen").

9Section 45-5-101 (Article 5's definitions section) does not include a definition of "estate," but context makes clear that the term "estate," as used in Article 5's conservatorship provisions, refers to "property," as discussed *infra. See also* § 45-1-201(A)(15) (defining "estate" as "includ[ing] the property of the . . . person whose affairs are subject to the [UPC] as the property was originally constituted and as it exists . . . during administration").

**{5}** The 2014 Order and "Letters and Acceptance" of guardianship and conservatorship stated no limitations on the powers of Guardian and Conservator but authorized Guardian to exercise all powers granted to guardians, and authorized Conservator to exercise all powers granted to conservators, in Article 5. *See* § 45-5-308(C) (stating, inter alia, that guardianship letters shall contain "the scope of the guardianship including the specific legal limitations imposed by the court on the powers of the guardian"); § 45-5-421.1(C) (same concerning conservatorship letters); NMSA 1978, § 45-5-312 (2009, amended 2019) (stating powers of guardians); §§ 45-5-424, -425 (stating powers of conservators).

**{6}** As to the guardianship, the 2014 Order determined that "guardianship is appropriate as the least restrictive form of intervention consistent with the preservation of the civil rights and liberties of [C.G.]"; appointed Guardian as "plenary guardian of [C.G.]"; and described Guardian's authority broadly as the "authority to act on behalf of [C.G.,] which includes but is not limited to" several enumerated powers and rights of access to information. The letters also described Guardian's broad "authority to act on behalf of [C.G.,]" and stated that Guardian "shall have full legal authority over [C.G.]"; "may exercise all powers granted to guardians in [Article 5]"; and "is appointed solely as guardian and not as conservator."

**{7}** As to the conservatorship, the 2014 Order described the scope of Conservator's authority as over C.G.'s estate, determining that "[t]here are no available alternative resources that enable the effective management of property and financial affairs for [C.G.] and the conservatorship is appropriate as the least restrictive form of intervention consistent with the preservation of her property." The letters stated that Conservator "shall have full legal authority over [the] estate of [C.G.]"; "may exercise all powers granted to conservators in [Article 5]"; and "shall serve solely as conservator of [C.G.'s] estate and shall not be her guardian."

**{8}** The 2014 Order and guardianship letters contain inconsistencies. As noted, the 2014 Order's decretal paragraphs ordered that "[t]he guardianship and conservatorship are in place until further order of the court." But the title described the appointments as "Temporary Guardian and Conservator," and one (non-decretal) sentence within stated that, "[i]n the event that [C.G.] is able to return to living independently without the need for placement in a residential facility, [Guardian] shall be relieved of her duties as guardian." The letters also stated, "In the event that [C.G.] returns to living independently outside a residential placement, [Guardian's] appointment as her guardian shall terminate."

## B. Subsequent Events and Proceedings

**{9}** C.G. lived in an assisted-living facility from the commencement of the guardianship/conservatorship until April 10, 2015, when she moved back to her home. On or about December 11, 2015, Guardian filed a letter addressed to the district court stating that she was "asking for [the] guardianship to be revoked at this time"; explaining that she "had assumed that [the] guardianship only lasted until [C.G.] moved out of [the

assisted-living facility]"; and that she was "requesting a hearing to reconsider [C.G.]'s need for guardianship." *See* NMSA 1978, § 45-5-307(C) (2009, amended 2019) (allowing a "petition for an order that the incapacitated person is no longer incapacitated and for removal or resignation of the guardian . . . by informal letter to the court or judge"). The letter also stated that C.G.'s "family is asking that one of them take the place of her guardianship" but that Guardian believed "a more objective guardian would be the best option."

**{10}** The record includes statements indicating that Guardian understood from the appointment documents that the guardianship terminated automatically when C.G. moved from the assisted-living facility back home, but that Guardian continued with guardianship duties in August 2015 after she learned that her understanding was incorrect and she needed to file a motion if she believed the guardianship should be revoked.

**{11}** In a later report to the court (filed February 9, 2016), Guardian confirmed that she served as C.G.'s guardian "from September 20, 2014 to [the] present time except for the period of time from April 10, 2015 to August 24, 2015[.]" This report also stated that C.G. had met and conferred with Richards at a legal fair that took place during the period when Guardian believed the guardianship was no longer in effect. In addition, this report described, among other things, Guardian's problems dealing with Conservator and C.G.'s daughters.

**{12}** In response to Guardian's letter request, the district court scheduled a motion hearing and status conference for January 21, 2016. *See* § 45-5-307(D), (F) (providing, inter alia, that "[u]nless waived by the court upon the filing of a petition to terminate a guardianship for reasons other than the death of the incapacitated person, the court shall follow the same procedures to safeguard the rights of the incapacitated person as those that apply to a petition for appointment of a guardian as set forth in Section 45-5-303" and "shall hold a status hearing . . . to determine the appropriate order to be entered").

**{13}** Attorneys representing Daughter filed an entry of appearance on January 14, 2016 and, on January 19, 2016, filed an emergency petition to remove Guardian; appoint a family member identified by name in the petition as temporary, successor guardian; continue the conservatorship; and re-evaluate C.G.'s capacity. The petition recites complaints about Guardian's performance of her duties, including her alleged failure to respond to Conservator's request that she prepare a budget and her "unilateral" decisions to move C.G. home and cease performing her guardianship duties without obtaining another cognitive evaluation and without seeking court guidance.[10] Richards also filed an entry of appearance "as counsel of record for [C.G.]" on January

---

10 Emails attached to the petition suggest that Conservator and Daughter were aware of and involved in at least some of these decisions and that Guardian informed Conservator and Daughter that she had learned she was wrong about the termination of her guardianship duties and that a motion would need to be filed if another family member wished to be appointed as temporary guardian. An email from Conservator expresses concern about the amount of money being spent, including on guardianship fees.

14, 2016. A letter executed on January 19, 2016, by Guardian "[i]n her capacity as Guardian for [C.G.,]" states that the letter "formalize[s] the agreement" whereby Guardian hired Richards "to assist [C.G.] with her guardianship, or even if she is under a guardianship, under [Guardian's] authority to hire [Richards,] pursuant to [Section] 45-5-312."

{14}   Richards appeared on behalf of C.G. at the January 21, 2016 hearing, with C.G., Guardian, Daughter, and Daughter's counsel in attendance and Conservator participating by telephone. Richards stated that he was there to present C.G.'s "preferences"; was concerned that C.G. might need representation if there were another hearing, and asked to be appointed as GAL. Guardian explained that she was confused by the guardianship letters and understood that she was no longer C.G.'s guardian after C.G. moved home. The court asked Guardian if she had "been acting . . . and recently serving" as C.G.'s guardian, and Guardian confirmed that she was. The court acknowledged that the word "temporary" appeared in the title of its 2014 Order and that "there is some contradiction in the letters that were issued," but noted the decretal language in the 2014 Order and stated, "I find the status quo is that there is a guardianship in place."

{15}   The district court found at the hearing that C.G. continued to need a guardian and conservator pending an evidentiary hearing to be scheduled. Among other rulings (later memorialized in a written order), the court (1) granted Daughter's emergency petition to continue the conservatorship and to re-evaluate C.G.'s capacity; (2) denied Guardian's motion for revocation of the guardianship and Daughter's emergency petition to remove Guardian and appoint a temporary successor guardian; (3) ordered that Guardian would continue to serve pending an evidentiary hearing to re-evaluate C.G.'s capacity and the necessary level of guardianship and conservatorship; and (4) ordered the appointment of a visitor, GAL, and QHCP to provide recommendations at that hearing. At the end of the hearing, the court stated, in response to a question from Daughter, "If you believe [the guardian is acting] totally outside her role, that's why you have your attorney, and we'll be back here."

{16}   In re-appointing the GAL who had served in the 2014 proceedings, the court stated at the hearing that the GAL had previously "[p]rovided a full and complete report to the court" and that she "is independent of all parties and will provide the court with an honest opinion as to what is appropriate in the best interests of the protected party." When Richards asked the court to clarify "[his] role now in this proceeding," the court responded, "That's sort of interesting. I'm not really sure. . . . But I appointed a guardian[11] who typically will be reporting to me not so much as her attorney but as an arm of the court as to what . . . he or she believes is in the best interests of . . . the protected person and at the same time I'm not sure she can or would advocate for [C.G.]'s position." When Richards asked whether he should send his fee bill to Conservator, the court responded, "I'm not so sure. I think that's an issue I have to

---

11The context—a response to Richards' question about his role going forward—indicates that the court was referring to the just-appointed GAL. A subsequent filing by Daughter states this interpretation.

resolve. I think the best way to approach that may be for you to file a motion and ask the court to rule on that." Guardian also asked that Richards be paid.

{17}    The record before us does not include this motion, and it does not appear on the docket as having been filed. The record does, however, include a January 27, 2016 "Response in Opposition to Motion to Allow Payment of Attorney Fees and for Reconsideration of Appointment of [GAL]" filed by Daughter's attorneys, which asserts (among other things) that Richards could not "fulfill the role of a [GAL] expressed by the [c]ourt at the January 21st hearing . . . to investigate the circumstances and provide the [c]ourt with information as a third-party objective professional" and that the fees for which Richards sought payment "were incurred without any legal authority at a time when [C.G.] was legally incapacitated and under the protection of a [c]ourt-appointed conservator." Citing Sections 45-5-17[12] and 45-5-424, the response argued that Conservator "has the exclusive authority to enter contracts on behalf of the incapacitated person, including contracts to retain lawyers and other advisors to protect the protected person's interests" and that, "[i]n direct defiance of the [UPC], neither [Guardian] nor . . . Richards contacted [Conservator] to discuss the reasons for . . . Richards' retention, . . . Richards' hourly rate, his expected fees, or the services he intended to provide for [C.G.]." In a January 29, 2016 reply, Richards cited "[G]uardian's right to hire or approve the hiring of an attorney under [Section] 45-5-312(B)" and argued that C.G. "needs someone to present her preferences to the [c]ourt and be heard" and that Section 45-5-424(C) "only gives . . . Conservator the authority to pay bills out of or collect funds for the protected person's estate."

{18}    The court's February 9, 2016 written order, concerning the matters discussed at the January 21, 2016 hearing, did not address the issues raised in Richards' post-hearing motion and Daughter's response. In addition to reciting the rulings noted above, including that Guardian and Conservator "shall remain" in their roles "until further order of the Court," the order directed Guardian and Conservator "to communicate directly with each other . . . and work together to provide for the best interests of [C.G.]" and directed Conservator to "approve reasonable requests of the Guardian for expenditures on behalf of [C.G.]" and "to approve or deny such requests within [twenty-four] hours."

{19}    On March 2, 2016, following the death of the GAL in late February 2016, the court issued an order appointing a successor GAL (not Richards, although he had reiterated his prior request to be appointed in that role), ordering that the GAL "serves as an arm of the court and assists the court in discharging its duty to adjudicate the best interests of [C.G.]" and "shall perform each of the duties as set forth in Sections 45-5-303.1 and 45-5-404.1[.]" The same day, the court issued an order setting a hearing to re-evaluate C.G.'s capacity and further ordering that a hearing "to determine the fees, if any, to be awarded to . . . Richards . . . for his services in representing [C.G.]" should be deferred and would be set "following the final resolution of the now existing mental capacity of [C.G.] and her need, if any, for a Guardian and/or Conservator."

---

12There is no such section, and the context does not clarify.

**{20}** On March 14, 2016, attorneys representing Conservator entered an appearance. A week later—two months after the January hearing at which Richards first appeared and argued for C.G. and six weeks after entry of the court's order concerning that hearing—Conservator's attorneys filed an emergency motion to strike Richards' entry of appearance, which Daughter joined, in which Conservator characterized the decision to hire Richards as "the latest in a series of questionable judgments by [G]uardian"; described "[G]uardian's actions" as the basis for Daughter's January 19, 2016 emergency petition to remove Guardian; and asserted that "neither [C.G.] nor [G]uardian has the capacity to contract with . . . Richards" and that Richards "is in direct conflict of interest to [C.G.] by seeking the payment of attorney fees from her estate." Citing Sections 45-5-402.1(B)(3)(d), -312, and -312(B)(4)(c), Conservator argued that "only . . . [C]onservator can enter into contracts on [C.G.'s] behalf"; "[w]ithout a specific finding that a guardian may contract on behalf of a ward, the guardian cannot enter into contracts on behalf of the incapacitated person"; Conservator did not consent to Richards' retention and Richards did not seek pre-approval from the court; the 2014 Order "does not grant [G]uardian any financial powers over [C.G.]'s estate"; and "[t]here is no provision in the [UPC] giving a guardian the power to contract a lawyer on behalf of the ward when a conservator is in place." While stating that he did "not wish to impede [C.G.'s] ability to have legal representation," Conservator contended that "counsel should be accountable to the [c]ourt[,]" and "[t]herefore, [C.G.]'s legal representation should occur through a [GAL], and not through private counsel whom [C.G.] lacks the capacity to direct."

**{21}** In opposing the motion to strike, Richards contended that the district court was aware he was representing C.G. pursuant to his contract with Guardian; Section 45-5-303(C) "allows [G]uardian to hire an attorney for [C.G.]"; and that Conservator must pay him "[u]nless the hiring was unreasonable, something never alleged[.]" Richards also argued that Section 45-5-402.1 describes powers of the district court, not conservators, and that the 2014 Order did not give Conservator sole authority to contract; Section 45-5-424 provides "the conservator's authority to hire an attorney for himself" but not for C.G., while Section 45-5-312(B) authorized Guardian to hire an attorney for C.G., and the district court's February 9, 2016 order "also gave [G]uardian authority to contract and it is [C]onservator's duty to 'approve reasonable requests of . . . Guardian for expenditures on behalf of [C.G.].' " Richards argued further that Conservator had "allowed the attorney fees to accumulate over several months without following the requirements of the February 9, 2016 Order or filing any objection of any nature with the [c]ourt until now" and that the costs to C.G.'s estate "have grown exponentially" because of Daughter's conduct and filings.

**{22}** On April 29, 2016, the GAL stated in an interim report that the fees for which Richards sought payment "have resulted from litigation almost exclusively focused upon [Richards'] status as counsel and payment of his attorney fees, which litigation has culminated in the [m]otion to [s]trike now before the court[,]" and expressed concerns about the impact on C.G. and her estate. Guardian filed a response on May 2, 2016, stating that the court proceedings were very stressful for C.G. and that she believed Richards' advocacy had helped C.G. to deal with that stress, noting that C.G. would not

otherwise have had an attorney to represent her wishes at the January 21, 2016 hearing, and that Guardian believed C.G. needed an attorney.

**{23}** On May 5, 2016, after holding a hearing on May 3, 2016, the district court issued a letter decision granting the motion to strike Richards' entry of appearance and entered an order on May 9, 2016, finding and ruling, in relevant part, as follows:

> 2. The Entry of Appearance of . . . Richards was filed five days prior to the signing by [Guardian] . . . of the Letter of Engagement which served as the contract between [C.G. and Guardian] and . . . Richards for the provision of legal representation for [C.G.] in this matter.
>
> . . . .
>
> 4. At the time . . . Richards was retained as counsel for [C.G.], she was not legally capable of entering into such a relationship or business arrangement with . . . Richards as [C.G.] had been found by this [c]ourt to be an incapacitated person who was incapable of making such a decision and for whom the [c]ourt appointed a guardian and conservator[.]
>
> 5. At the time of the retention of . . . Richards as counsel for [C.G.], the legal status of [C.G.] had not changed and could not be changed without further order of the [c]ourt.
>
> 6. At the time that . . . Guardian . . . signed the Letter of Engagement ostensibly hiring . . . Richards as attorney for [C.G.] in this matter, she did not have the authority to hire an attorney for [C.G.]. [*See Gardner v. Gholson* (*In re Gardner*)], 1992-NMCA-122, ¶ 23[, 114 N.M. 793, 845 P.2d 1247]; [*see also*] NMSA 1978, §§ 45-1-201(A)(21) [(2011)] (definition of guardian), 45-5-312 (powers of guardian).
>
> 7. At the time of the retention of . . . Richards as counsel for [C.G.], the only individual who had the authority to retain an attorney for [C.G.] was and is the [c]ourt-appointed [C]onservator. [*See In re*] *Gardner*, 1992-NMCA-122, ¶ 23; NMSA 1978, §§ 45-5-101(A) [(2011, amended 2019)] (definition of conservator), 45-5-424 (powers of conservator).
>
> 8. [Section] 45-5-402.1 does not limit or otherwise deprive a conservator of any of the powers granted to a conservator[,] pursuant to [Section] 45-5-424; it merely grants the [c]ourt the power to act for the incapacitated person on its own or through the conservator.
>
> 9. . . . Conservator did not ratify nor otherwise approve the contract between . . . Guardian[] and . . . Richards.

10. Rather, . . . Conservator, through his spouse, informed . . . Richards that he should not act as attorney for [C.G.] until the contract was approved by . . . Conservator, which has never been done.

11. Further [Daughter], in her Response in Opposition to Motion to Allow Payment of Attorney Fees and for Reconsideration of Appointment of Guardian Ad Litem filed herein on January 27, 2016, argued that neither [C.G.] nor [Guardian] had legal authority to retain . . . Richards and that . . . Richards accepted retention . . . without requesting the concurrence of, or even contacting [C.G.]'s [c]ourt-appointed Conservator[.]

. . . .

13. Given his experience and expertise in this area, . . . Richards should know or should have known that his retention as attorney for [C.G.], either by [C.G.] herself or in concert with . . . [G]uardian, under these circumstances was not permitted by law. . . .

IT IS THEREFORE ORDERED ADJUDICATED AND DECREED THAT

A. The Entry of Appearance of . . . Richards, . . . as attorney for [C.G.] herein shall be stricken as being done contrary to law and without proper authority of the [c]ourt and/or the Conservator.

B. . . . Richards will henceforth cease acting as attorney or counselor at law or agent for [C.G.] in this matter.

C. . . . Richards shall have no further contact with [C.G.]

D. The issues with respect to payment of the attorney fees of . . . Richards remains to be decided by the [c]ourt at a future hearing on . . . Richard[s'] [m]otion for [p]ayment of [a]ttorney [f]ees.

**{24}** Richards timely filed this appeal against Conservator, in his own name, challenging the district court's order striking his entry of appearance.

## DISCUSSION

### A. Richards Is Directly Aggrieved By and May Appeal the District Court's Order Striking His Entry of Appearance as C.G.'s Attorney

**{25}** Conservator argues that this Court lacks jurisdiction to consider this appeal because Richards was not a party to the proceedings below, "by intervention or otherwise[,]" and therefore "lacks standing to assert claims that a guardian can hire an attorney without the authority of the conservator or the [c]ourt." Conservator also contends that Richards did not present and the district court did not rule on arguments

concerning whether an incapacitated person has the legal right to hire counsel and that this case does not warrant application of the "great public importance" doctrine as a basis to recognize standing. Richards' arguments in response are not clearly presented and are at cross purposes; at times, indicating that Richards appeals on his own behalf, as an attorney barred from representing C.G. in this case and based on what he characterizes as the district court's refusal to address his request for payment of fees, at other times suggesting that he appeals on C.G.'s behalf on the ground that C.G. "was denied the legal counsel of her, and her guardian's, choice." Nevertheless, we understand Richards to argue that he has standing as an "interested person," has met third-party standing requirements, and standing should be recognized under "the great public importance doctrine."

{26}    Conservator and Richards misstate the issue, which is not whether Richards has standing to bring a cause of action (as in the majority, if not all, cases cited by Conservator) but whether he has a right to appeal from the district court's order striking his entry of appearance and barring him from contact with C.G., the person he was hired to represent. *See* 15A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3902 (2d ed. 2019) ("The most obvious difference between standing to appeal and standing to bring suit is that the focus shifts to injury caused by the judgment rather than injury caused by the underlying facts."). "To invoke the jurisdiction of the Court of Appeals, the right to take an appeal must be granted by the Constitution or by statute." *State v. Armijo*, 2016-NMSC-021, ¶ 24, 375 P.3d 415. Whether a party has a right to appeal is a question of law reviewed de novo. *See id.* ¶ 19 (observing that "[t]he right to appeal is . . . a matter of substantive law created by constitutional or statutory provision" and is an issue subject to de novo review). NMSA 1978, Section 45-1-308 (1975) states that "[a]ppellate review, including the right to appellate review, . . . is governed by the rules applicable to civil appeals to the court of appeals from the district court." And NMSA 1978, Section 39-3-2 (1966), which governs civil appeals from the district court, allows a right of appeal to "any party aggrieved" by a district court's decision, order, or judgment. We conclude that Richards has the right to appeal on his own behalf in the circumstances presented here.

{27}    Richards participated in the proceedings below solely as an attorney hired to represent C.G. in an Article 5 proceeding initiated by Guardian's request that the district court determine whether guardianship continued to be necessary. Richards did not initiate or seek to participate in that proceeding as an "interested person."[13] Nor did he

---

[13]Section 45-5-101(I) defines "interested person" as "any person who has an interest in the welfare of the person to be protected pursuant to . . . Article 5[.]" The definition includes a potentially broad class of persons but does not address what those persons may do in an Article 5 proceeding. Other provisions state specific things "interested persons" may do in an Article 5 proceeding, such as file a petition seeking appointment of a guardian, *see* § 45-5-303(A), or a conservator, *see* § 45-5-404; *see also, e.g.*, NMSA 1978, § 45-5-309 (2009, amended 2018) (interested persons may receive notice in guardianship proceedings); § 45-5-406 (same in conservatorship proceedings); § 45-5-307(C) (interested persons may petition for removal of guardian or termination of guardianship); § 45-5-415(C) (same as to conservator). But no provision affords "interested persons" a right to appeal. *Cf. McNeill v. Rice Eng'g & Operating, Inc.*, 2010-NMSC-015, ¶ 1, 148 N.M. 16, 229 P.3d 489 (adopting this Court's opinion holding that statute providing for commencement of statute of limitations in trespass action does

need to do so, or to move to intervene in that proceeding as a party. It goes without saying that attorneys appear on behalf of persons involved in guardianship and conservatorship proceedings, as attorneys representing Conservator and Daughter did in this case. *Cf. Chisholm v. Rueckhaus*, 1997-NMCA-112, ¶¶ 4-7, 124 N.M. 255, 948 P.2d 707 (distinguishing between representation of another as a party and as an attorney in a case addressing the unauthorized practice of law). No one objected on the record to Richards' participation as C.G.'s attorney when he entered his appearance, or at any time during the January 21, 2016 hearing. When Richards asked the court at that hearing about his role, the district judge said he was "not sure." And, although Daughter opposed Richards' post-hearing motion requesting payment of attorney fees and reconsideration of the court's GAL appointment, no one asked the court to ban Richards from participating in the case until two months after the January 21, 2016 hearing, and the court did not prohibit Richards from participating until almost two months after Conservator filed his motion, when the court issued its May 5, 2016 letter decision, and entered its May 9, 2016 order granting Conservator's motion. That order directly aggrieved Richards himself, as an attorney ejected from the case and barred from further contact with C.G., and this suffices to afford Richards the right to appeal from that order on his own behalf, notwithstanding that he did not participate as a party in the proceeding giving rise to the order.

**{28}** Although it is not often that attorneys appeal on behalf of themselves in cases in which they represent a litigant, they do so when an order entered in the case disqualifies or otherwise adversely impacts them individually, as attorneys. And courts recognize that such orders directly and sufficiently aggrieve the attorneys so as to establish standing to appeal—even in federal court, where standing is a constitutional requirement. *See, e.g.*, *Weeks v. Indep. Sch. Dist. No. I-89*, 230 F.3d 1201, 1207 (10th Cir. 2000) (explaining that "[c]ounsel have standing to appeal orders that directly aggrieve them" and that attorney has standing to appeal a district court order that disqualified him from the case and therefore "directly affect[ed]" the attorney); *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir. 1993) (explaining that "[t]o have standing, one must be aggrieved by the order from which appeal is taken" and that "[c]ounsel have standing to appeal from orders issued directly against them, but not from orders applicable only to their clients" (citations omitted)); *Riggs v. Scrivner, Inc.*, 927 F.2d 1146, 1149 (10th Cir. 1991) ("Plaintiff's attorney, rather than plaintiff, was the party aggrieved by the district court's imposition of sanctions and, therefore, was the proper party to appeal from this decision."). As then-Judge Gorsuch has explained:

> Generally speaking, only named parties to a lawsuit in the district court may appeal an adverse final judgment. After all, it is usually only parties who are sufficiently aggrieved by a district court's decision that they possess Article III and prudential standing to be able to pursue an appeal of it.

not afford standing to bring a cause of action for trespass). As noted, the only UPC provision that addresses appellate review, Section 45-1-308, states that Section 39-3-2 governs the right to appeal in UPC proceedings.

. . . .

> Of course, the rules of contemporary civil litigation are replete with exceptions[.] . . . Those who are the subject of civil contempt orders, sanctioned attorneys, class members who object to a judgment settling their rights—among others—may sometimes be parties to an appeal even though they were not named parties in the district court litigation. Like named parties, these individuals possess Article III standing in the sense that they have been injured by a district court ruling and a favorable decision on appeal would ameliorate that injury. They also possess prudential standing; they do because they don't seek to pursue another person's legal rights, litigate a mere generalized grievance, or raise a challenge falling outside the zone of interests protected by the law involved. And of particular note, the individuals in each of these situations (1) personally appeared in district court; (2) suffered a real and concrete injury as a result of a district court ruling that is entitled to preclusive effect; and (3) possess interests that would not, on appeal, be adequately represented by the named parties to the district court lawsuit.

*Raley v. Hyundai Motor Co.*, 642 F.3d 1271, 1274-75 (10th Cir. 2011) (citations omitted). So it is here.

**{29}** Our Supreme Court held in *De Vargas Savings & Loan Ass'n of Santa Fe v. Campbell*, 1975-NMSC-026, 87 N.M. 469, 535 P.2d 1320, that four savings and loan associations "clearly have standing to seek review of" an order entered under the New Mexico Savings and Loan Act "as associations 'aggrieved and directly affected' by the order." *Id.* ¶¶ 1, 16. In the course of its analysis, the Court explained that "New Mexico has always required allegations of direct injury to the complainant to confer standing[,]" but "*once the party seeking review alleges he himself is among the injured, the extent of injury can be very slight.*" *Id.* ¶¶ 11-12 (emphasis added). The district court's order striking Richards' entry of appearance and barring him from further contact with C.G. directly and sufficiently aggrieved Richards such that Section 39-3-2 affords him the right to appeal that order, even though he did not participate as a party below. Having concluded that Richards has the right to appeal on those grounds, we do not address the other arguments made on this issue. We caution that our conclusion in this case should not be construed as a broad holding that any attorney who has entered an appearance in an Article 5 proceeding (or any probate proceeding) necessarily has standing to appeal on his or her own behalf from any order entered in such proceeding.

**B.    Guardian Had Authority to Hire Richards**

**1.    Preliminary Matters**

**a.    There Is a Single Order on Appeal and Our Review of That Order Is Limited**

**{30}** Richards' briefing evidences a failure to appreciate that we have a single order before us—the order striking his entry of appearance—and that our role as an appellate court (an intermediate one at that) is limited. We therefore note the following principles at the outset.

**{31}** First, we ordinarily do not address matters not ruled on in the order appealed from; for example, Richards' request for payment of his fees, the purported conduct and motivations of family members and court-appointed professionals, and the propriety of different orders not appealed, all of which are discussed in Richards' appellate briefing. *See, e.g.*, *Batchelor v. Charley*, 1965-NMSC-001, ¶ 6, 74 N.M. 717, 398 P.2d 49 (declining to review issue where the appellant failed to meet the burden "to show that the question presented for review was ruled upon by the [district] court"); *Luevano v. Group One*, 1989-NMCA-061, ¶ 7, 108 N.M. 774, 779 P.2d 552 (stating, in declining to address issues, that "[a]n appellant has the burden of showing that a question presented for review on appeal was ruled upon by the [district] court"); *Herrera v. Fluor Utah, Inc.*, 1976-NMCA-045, ¶ 10, 89 N.M. 245, 550 P.2d 144 ("[T]he substantiality of the evidence to support the [district] court's findings . . . is not the appellant's basis for appeal and the court would exceed its appellant function in addressing this issue.").

**{32}** Second, we do not consider arguments not made in the district court, nor arguments that differ from those presented there concerning the order on appeal. *See, e.g.*, *Nance v. L.J. Dolloff Assocs.*, 2006-NMCA-012, ¶ 12, 138 N.M. 851, 126 P.3d 1215 ("[W]e review the case litigated below, not the case that is fleshed out for the first time on appeal." (internal quotation marks and citation omitted)); *State v. Franco*, 2004-NMCA-099, ¶ 21, 136 N.M. 204, 96 P.3d 329 (rejecting argument because it "was not the basis on which the case was tried, and we will not allow the [s]tate to change its position on appeal"), *rev'd on other grounds*, 2005-NMSC-013, ¶ 1, 137 N.M. 447, 112 P.3d 1104; *Woolwine v. Furr's, Inc.*, 1987-NMCA-133, ¶ 20, 106 N.M. 492, 745 P.2d 717 ("To preserve an issue for review on appeal, it must appear that [the] appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court.").

**{33}** Third, we do not consider arguments that rely on representations for which no record evidence is cited or that are unsupported by the evidence cited. *See Murken v. Solv-Ex Corp.*, 2005-NMCA-137, ¶ 14, 138 N.M. 653, 124 P.3d 1192 ("[W]e decline to review . . . arguments to the extent that we would have to comb the record to do so."); *see also Muse v. Muse*, 2009-NMCA-003, ¶ 42, 145 N.M. 451, 200 P.3d 104 ("We are not obligated to search the record on a party's behalf to locate support for propositions a party advances or representations of counsel as to what occurred in the proceedings."); *In re Aaron L.*, 2000-NMCA-024, ¶ 27, 128 N.M. 641, 996 P.2d 431 ("This Court will not consider and counsel should not refer to matters not of record in their briefs."); *Flowers v. White's City, Inc.*, 1992-NMCA-062, ¶ 7, 114 N.M. 73, 834 P.2d 950 ("[T]he presence of documents in the record proper does not automatically mean that the information they contain is evidence of record or that it is legally admissible.").

**{34}** We see no basis to depart from the foregoing principles here.

### b.    We Dispose of Two Arguments at the Outset

**{35}**    Applying these principles, and in an effort to maintain clarity in our analysis, we dispose of two arguments Richards appears to emphasize, while failing to develop them,[14] before we address the substantive issue presented.

**{36}**    First, to the extent Richards argues that C.G. was "legally competent to hire her own attorney" and lawfully hired Richards herself, we decline to consider this argument. Richards does not direct us to anything in the record showing that he asked the district court to rule in his favor on the ground that C.G. was "legally competent" to hire him. And the record is replete with Richards' representations to the court that C.G. did *not* hire him and that Guardian did, as reflected in the letter agreement. As noted, "we review the case litigated below, not the case that is fleshed out for the first time on appeal." *Nance*, 2006-NMCA-012, ¶ 12 (alteration, internal quotation marks, and citation omitted).

**{37}**    Second, Richards' assertions to the effect that C.G. "was not under a guardianship as a result of her living independently" provide no basis for reversal. We understand these statements to refer to use of the word "temporary" in the title of the 2014 Order and the sentence in the 2014 Order and guardianship letters stating that Guardian's duties would end if C.G. returned to "living independently." At the January 21, 2016 hearing, the district court acknowledged the inconsistency with the 2014 Order's decretal paragraph ordering that "[t]he guardianship and conservatorship are in place until further order of the court" but nonetheless found "there is a guardianship in place." The court's statements and finding reasonably resolved any ambiguity and clarified that the guardianship did not terminate and was in place when Guardian hired Richards to represent C.G. in the proceeding to determine whether the guardianship should continue. *See Fed. Nat'l Mortg. Ass'n v. Chiulli*, 2018-NMCA-054, ¶ 14, 425 P.3d 739 (explaining that "the judge who issues the order or judgment is in the best position to clarify any ambiguity in the order because that judge is familiar with the entire record and all the circumstances under which it was issued" and this Court "will not disturb a trial court's clarification of an ambiguity in its own order unless the court's interpretation of that order is manifestly unreasonable" (internal quotation marks and citation omitted)); *see also Jeantete v. Jeantete*, 1990-NMCA-138, ¶ 11, 111 N.M. 417, 806 P.2d 66 (stating that "the reviewing court may consider the [district] court's verbal comments in order to clarify or discern the basis for the order or action of the court

---

[14] Based on the principles governing appellate review outlined above, and because appellate courts cannot make findings of fact, we also do not address the extensive list of assertions Richards "request[s] that this Court find." *See Scott v. Jordan*, 1983-NMCA-022, ¶ 22, 99 N.M. 567, 661 P.2d 59 (stating that "an appellate court cannot make [factual] findings of its own"); *see also State ex rel. Children, Youth & Families Dep't v. Keon H.*, 2018-NMSC-033, ¶ 55, 421 P.3d 814 (reversing this Court's decision where "[t]he Court of Appeals usurped the role of the district court by reweighing the evidence and failing to give deference to the district court's determinations"); *State ex rel. Dep't of Human Servs. v. Williams*, 1989-NMCA-008, ¶ 7, 108 N.M. 332, 772 P.2d 366 ("We defer to the [district] court . . . because the [district] court is in a better position than we are to make findings of fact and also because that is one of the responsibilities given to [district] courts rather than appellate courts.").

below"). There is nothing manifestly unreasonable in the district court's interpretation of its 2014 Order, and Richards does not argue otherwise.

**{38}**   We note as well that our Supreme Court has admonished that persons subject to court orders are "not at liberty to select one clause from the judgment, place his interpretation thereon, rely entirely upon this interpretation, and disregard all the remainder of the decretal portion of the judgment, the findings of fact and conclusions of law." *Greer v. Johnson*, 1971-NMSC-127, ¶¶ 6, 8, 83 N.M. 334, 491 P.2d 1145 (holding, in a case in which the defendant claimed to rely on language in a judgment that was "totally inconsistent with and refuted by" other language in "the findings, conclusions and decretal portion of the judgment[,]" that defendant "was obliged to construe" language he believed to be ambiguous "in the light of the pleadings, the remaining portions of the judgment, the findings of fact and conclusions of law").

## 2.   We Reverse on the Substantive Question Presented

**{39}**   The substantive question before us is whether the district court erred in ordering that Richards' entry of appearance as C.G.'s attorney "shall be stricken as being done contrary to law and without proper authority of the [c]ourt and/or . . . Conservator" based on its conclusions that (1) Guardian had no legal authority to hire an attorney to represent C.G. and (2) only Conservator had that authority. As noted, the text of the 2014 Order and letters stated no limitations on the powers of Guardian, as "plenary guardian of [C.G.]," or those of Conservator, as "conservator of the estate of [C.G.]." Our task thus primarily involves interpretation and application of the relevant statutes using established principles of statutory construction, an issue of law reviewed de novo. *In re Borland*, 2012-NMCA-108, ¶ 8, 288 P.3d 912 (stating that "statutory construction of various provisions of the Probate Code" presents "an issue of law that we review de novo").

**{40}**   "When construing statutes, our guiding principle is to determine and give effect to legislative intent[,]" considering the language of the provisions at issue "in the context of the statute as a whole, including the purposes and consequences of the Act." *Baker v. Hedstrom*, 2013-NMSC-043, ¶¶ 11, 15, 309 P.3d 1047 (internal quotation marks and citation omitted); *see also In re Portal*, 2002-NMSC-011, ¶ 5, 132 N.M. 171, 45 P.3d 891 ("Statutes are to be read in a way that facilitates their operation and the achievement of their goals." (internal quotation marks and citation omitted)). NMSA 1978, Section 45-1-103 (1975) states that "[t]he principles of law and equity supplement the [UPC]'s provisions, unless specifically displaced by particular provisions of the code."

### a.   The District Court's Jurisdiction and Authority

**{41}**   The Probate Code and Article 5 grant district courts exclusive original jurisdiction in guardianship and conservatorship proceedings. *See* NMSA 1978, § 45-1-302(A)(3) (2011); § 45-5-102(C). As to conservatorship proceedings, Section 45-5-402 more particularly provides that, "until termination of the proceeding," the court in which a

petition seeking appointment of a conservator is filed has "exclusive jurisdiction" to determine the need for conservatorship and how the estate of the person for whom a conservator is appointed "shall be managed, expended or distributed to or for the use of" the person for whom a conservator is appointed and "jurisdiction to determine the validity of claims against the person or estate of the protected person and his title to any property or claim." Section 45-5-402.1 further provides that the district court has certain powers "that may be exercised directly or through a conservator in respect to the estate and financial affairs of a protected person[,]" which "include, but are not limited to the power to . . . enter into contracts[.]" Section 45-5-402.1(B)(3)(d).

{42}    In addition to indicating legislative intent to give district courts exclusive jurisdiction and supervisory authority over guardianship and conservatorship proceedings, Article 5's text evidences legislative intent to preserve and protect the rights of incapacitated persons, permitting district courts to impose guardianship and conservatorship, as relevant here, only to the extent made necessary by the incapacitated person's limitations. *See* § 45-5-301.1 (stating that guardianship may be imposed "only as is necessary to promote and to protect the well being of the person . . . [and] only to the extent necessitated by the person's actual functional mental and physical limitations" and that "[a]n incapacitated person for whom a guardian has been appointed retains all legal and civil rights except those which have been expressly limited by court order or have been specifically granted to the guardian by the court"); § 45-5-402.1(A) ("The court shall exercise the authority conferred in [Article 5] to encourage the development of maximum self-reliance and independence of a protected person and make protective orders only to the extent necessitated by the protected person's mental and adaptive limitations and other conditions warranting the procedure."); *see also* § 45-5-101(J) (defining "least restrictive form of intervention" to mean that "the guardianship or conservatorship imposed . . . represents only those limitations necessary to provide the needed care and rehabilitative services and that the incapacitated person . . . shall enjoy the greatest amount of personal freedom and civil liberties").

## b.    Conservator Powers Under Article 5

{43}    The letters establishing the scope of Conservator's authority stated that Conservator "may exercise all powers granted to conservators in [Article 5]." Section 45-5-401(B) states that the authority of a conservator relates to "the estate and financial affairs of" incapacitated persons, and Section 45-5-417 requires conservators to act as fiduciaries in the exercise of their powers. It is clear that "estate," as used in Article 5's conservatorship provisions, refers to "property." *See* § 45-1-201(A)(15) (defining "estate" as "includ[ing] the property of the . . . person whose affairs are subject to the [UPC] as the property was originally constituted and as it exists . . . during administration"); *In re Borland*, 2012-NMCA-108, ¶ 10 (stating that a conservatorship (protective) proceeding "is generally limited to the management, expenditure, and distribution of a protected person's property in order to maximize self-reliance and interdependence of the protective person").

**{44}** Section 45-5-424(A), (B) provides that "[a] conservator has all of the powers conferred herein and any additional powers conferred by law on trustees in New Mexico" and may "without court authorization or confirmation, . . . invest and reinvest funds of the estate as would a trustee." Section 45-5-424(C)(23), (25) enumerates specific tasks related to the management of estate assets as to which "[a] conservator, *acting reasonably in efforts to accomplish the purpose for which he was appointed*, may act without court authorization or confirmation," including to "employ persons, including attorneys, . . . to advise or assist him *in the performance of his administrative duties*[,]" and "execute and deliver all instruments which will accomplish or facilitate *the exercise of the powers vested in the conservator*." (Emphases added.)[15]

### c. Guardian Powers Under Article 5

**{45}** While the statutory text governing conservators in Article 5 proceedings is clear that the authority of conservators relates to the incapacitated person's *property and financial affairs*, the text governing guardians makes clear that the authority of guardians relates to "the care, custody or control of the *person*" determined to be incapacitated, with this authority to be exercised "in a manner that is least restrictive of the protected person's personal freedom and consistent with the need for supervision." Section 45-1-201(A)(21) (emphasis added) (defining "guardian"); Section 45-5-312(B)(5) (stating that "the guardian shall exercise the guardian's supervisory powers over the incapacitated person in a manner that is least restrictive of the incapacitated person's personal freedom and consistent with the need for supervision"). The 2014 Order and the guardianship and conservatorship letters likewise make clear that Guardian has power over C.G.'s person and Conservator over C.G.'s property.

**{46}** Article 5's guardianship provisions do not contain an analogue to Section 45-5-417, which requires conservators to act as fiduciaries, but the definition of "fiduciary" in the UPC includes guardian and GAL, as well as conservator (among others), *see* § 45-1-201(A)(17), suggest legislative intent that these professionals act as fiduciaries as well. Section 45-5-312(B), as it read at the time relevant to this appeal, states that "[a] guardian of an incapacitated person has *the same powers, rights and duties respecting the incapacitated person that a parent has respecting an unemancipated minor child*, except that a guardian is not legally obligated to provide from the guardian's own funds

---

[15]Conservator's brief mentions Section 45-5-425, which authorizes conservators to "expend or distribute income or principal of the estate without court authorization or confirmation for the protected person and his dependents in accordance with" certain principles, which include requirements that conservators "consider recommendations relating to the appropriate standard of support, care, education or benefit for the protected person made by a parent, guardian or custodian," and "expend or distribute sums reasonably necessary for the support, education, care or benefit of the protected person with due regard to" considerations that include "the size of the estate" and "the probable duration of the conservatorship[.]" Section 45-5-425(A)(1), (2)(a). Conservator and the district court did not rely on this provision below, and Conservator presents no argument based on it here. Accordingly, we do not consider it further. *See, e.g.*, *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 (refusing to review unclear and undeveloped arguments or to "guess at what [the] arguments might be"); *Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005-NMCA-022, ¶ 14, 137 N.M. 26, 106 P.3d 1273 ("[O]n appeal, the party must specifically point out where, in the record, the party invoked the court's ruling on the issue. Absent that citation to the record or any obvious preservation, we will not consider the issue.").

for the incapacitated person and is not liable to third persons for acts of the incapacitated person solely by reason of the guardianship." (Emphasis added.)

**{47}** Section 45-5-312(B) goes on to list particular powers after stating as follows: "In particular *and without qualifying the foregoing*, a guardian or the guardian's replacement has the following powers and duties, except as modified by order of the court[.]" (Emphasis added.) The list includes certain guardian powers and duties "if no conservator for the estate of the incapacitated person has been appointed, if the court has determined that a conservatorship is not appropriate and if a guardian appointed by the court has been granted authority to make financial decisions on behalf of the protected person in the order of appointment and in the letters of guardianship." Section 45-5-312(B)(4).

**d.      The Text of Article 5 at the Relevant Time and the Documents Establishing the Guardianship and Conservatorship Did Not Unambiguously Give Conservator Exclusive Authority to Hire an Attorney for the Purpose for Which Richards Was Hired or Prohibit Guardian From Doing so Without Pre-approval From Conservator or the District Court in These Circumstances**

**{48}** As noted, Section 45-5-424(C)(23) authorizes conservators to "employ persons, including attorneys" without "court authorization or confirmation." To the extent Conservator relies on this provision in support of his argument that Conservator has exclusive authority to hire attorneys on behalf of C.G., that reliance is misplaced, as the authority afforded is textually limited to employment by "[a] conservator, acting reasonably in efforts to accomplish the purpose for which he was appointed" for the purpose of advising or assisting the conservator "in the performance of his administrative duties[,]" § 45-5-424(C)(23), and those "administrative duties" are limited to management of the incapacitated person's property and financial affairs. *See* § 45-5-101(A) (defining "conservator" as "a person who is appointed by a court to manage the property or financial affairs or both of a protected person").

**{49}** As also noted, Section 45-5-402.1(B)(3)(d) includes a list of certain powers the court may exercise "directly or through a conservator in respect to the estate and financial affairs of a protected person[,]" including the power to "enter into contracts." This statute describes aspects of the district court's jurisdiction and authority in conservatorship proceedings, which are established generally as to both guardianship and conservatorship proceedings in Section 45-5-102(C) and Section 45-1-302(A)(3). While the 2014 conservatorship letters stated that Conservator "may exercise all powers granted to conservators in [Article 5,]" they did not state that Conservator's authority included all powers the court may exercise "directly or through a conservator." In contrast to the district court's apparent interpretation, we do not read Section 45-5-402.1 as automatically conferring on conservators all the powers that statute gives to courts, such that those powers should be assumed to be necessarily included in "all powers granted to conservators in [Article 5.]"

**{50}** We note also that, although Article 5 provides a mechanism by which "[a] conservator may petition the appointing court for instructions concerning his fiduciary responsibility[,]" Section 45-5-416(B), and the court may provide instructions or make orders "[u]pon notice and hearing," Section 45-5-416(C), Conservator did not invoke the district court's jurisdiction as to the question of Richards' retention until after Richards entered his appearance and advocated for C.G. at the January 21, 2016 hearing; nor did the court exercise its jurisdiction to rule on the respective authority and obligations of Guardian and Conservator until months after that hearing, although Richards asked the court to clarify his role and the procedure to seek payment of his fees at the January 21, 2016 hearing and in a motion filed shortly thereafter, which Daughter opposed.

**{51}** At the time relevant to this appeal, Section 45-5-312(B) conferred on guardians "the same powers, rights and duties respecting the incapacitated person that a parent has respecting an unemancipated minor child[.]" Conservator argues that "[a] guardian has no power to contract for the purpose of retaining counsel if a conservator was already appointed." In the district court (but not here), Conservator relied on Section 45-5-312(B)(4), which states guardian powers and duties "if no conservator for the estate of the incapacitated person has been appointed, if the court has determined that a conservatorship is not appropriate and if a guardian appointed by the court has been granted authority to make financial decisions on behalf of the protected person in the order of appointment and in the letters of guardianship." In asserting in this Court that "New Mexico statutes, as well as established law, clearly hold that only conservators can hire counsel on behalf of the protected person unless the guardian is granted such powers in the appointing order[,]" Conservator cites Section 45-5-312(C), which states:

> A guardian of an incapacitated person for whom a conservator also has been appointed shall control the care and custody of the incapacitated person and is entitled to receive reasonable sums for services and for room and board furnished to the incapacitated person. The guardian may request the conservator to expend the incapacitated person's estate by payment to third persons or institutions for the incapacitated person's care and maintenance.

**{52}** Neither provision supports Conservator's contentions. Section 45-5-312(B)(4) enumerates additional powers of guardians where there is no conservator, a circumstance not presented here, and without qualifying the broad authority granted in Section 45-5-312(B). Although Section 45-5-312(C) addresses circumstances involving both a guardian and a conservator, it does not clearly abrogate the broad authority granted in Section 45-5-312(B). Read in context, these statutes do not unambiguously state a per se rule that grants Conservator exclusive authority to hire an attorney to represent C.G. in an Article 5 proceeding concerning whether the guardianship should continue, and/or prohibits Guardian from hiring an attorney for that purpose without pre-approval by Conservator or the district court. And we decline to read into Article 5 words the Legislature did not include. *See Sec. Escrow Corp. v. Taxation & Revenue Dep't*, 1988-NMCA-068, ¶ 7, 107 N.M. 540, 760 P.2d 1306 ("[W]e cannot add a requirement that is not provided for in the statute or read into it language that is not there[.]").

**{53}** We have previously interpreted Section 45-5-312(B) as "grant[ing] guardians exceedingly broad powers" that include "the authority to interfere in the most intimately personal concerns of an individual's life." *Nelson v. Nelson*, 1994-NMCA-074, ¶ 16, 118 N.M. 17, 878 P.2d 335 (citing Section 45-5-312(B) and highlighting subsections enumerating particular guardian powers). In so doing, we reasoned that the particular powers enumerated in Section 45-5-312(B) "are listed 'without qualifying' the power of the guardian to act as a parent, and therefore they should be read as illustrative of the nature of the guardian's power." *Nelson*, 1994-NMCA-074, ¶ 16. *Nelson* reversed the district court's dismissal of a divorce petition, describing the issue on appeal as "whether a legally incompetent spouse may initiate divorce proceedings in New Mexico through a legal guardian." *Id.* ¶ 1. In holding that the guardian had authority to bring a contested divorce action on behalf of the incapacitated person, *Nelson* acknowledged that Section 45-5-312 did "not expressly grant[] authority to the guardian to initiate a divorce action on behalf of a ward," *Nelson*, 1994-NMCA-074, ¶ 16, but concluded that "it would be anomalous for us to hold that a guardian in New Mexico did not have the authority to file for divorce in light of the statutory provisions governing both guardianships and divorces[,]" *id.* ¶ 19, and that, "[g]iven the existing New Mexico statutes, it makes little sense to adopt a per se rule arbitrarily limiting the ability of a guardian to act for her or his ward in a divorce action." *Id.* ¶ 22.

**{54}** The circumstances in *Nelson* differ from the circumstances of this case, most notably in that the person appointed as guardian in *Nelson* had been appointed conservator as well. *Id.* ¶ 1. *Nelson* did not state any limitations on its holding applicable in circumstances in which, as here, the guardian and conservator are different people and the conservator opposes the guardian's decision to hire an attorney to represent the incapacitated person in a proceeding concerning whether the guardianship should continue. But *Nelson* also did not address expenditures of estate funds. While *Nelson* is not dispositive of the question before us, we nevertheless find instructive its interpretation of Section 45-5-312(B) as granting authority to guardians in connection with a legal proceeding pertaining to the incapacitated person herself, as distinct from the person's property, a proceeding concerning a personal matter unrelated to the medical needs, care, or custody of the incapacitated person. The out-of-state cases cited by Conservator, in which conservators brought suit under various circumstances, do not establish that a guardian may never initiate suit on behalf of an incapacitated person,[16] and *Nelson* is to the contrary. And it makes no more sense "to adopt a per se rule arbitrarily limiting the ability of a guardian to act for her or his ward[,]" 1994-NMCA-074, ¶ 22, by hiring an attorney for the purpose for which Guardian hired Richards than to adopt a per se rule barring a guardian from initiating a divorce action on behalf of an incapacitated person.

---

[16]Many states have adopted the UPC, but they have done so with significant variations. For these reasons, and because of factual differences, we have not found out-of-state cases to be helpful and do not rely on them, although we do cite a few. *See State v. Bybee*, 1989-NMCA-071, ¶ 14, 109 N.M. 44, 781 P.2d 316 (stating that cases from other jurisdictions are "distinguishable by reason of the differences in the specific language of the statutes involved").

**{55}** *In re Gardner*, upon which Conservator and the district court's order striking Richards' entry of appearance rely, does not require a different interpretation of Article 5. *Gardner* did not involve an Article 5 proceeding, but was a probate case in which devisees under a will sued the personal representative of a probate estate concerning the disposition of estate assets. 1992-NMCA-122, ¶¶ 1-16. Ten years before her death, the decedent in *Gardner* was "adjudged incompetent" and Ghoulson (decedent's daughter, who would serve as personal representative of decedent's estate) "was named guardian of [the decedent's] estate" in a court order that granted Ghoulson "the power to manage and control [real property the petitioners were told they would inherit] and the authority to deposit money . . . and also to withdraw funds from the same account to pay the necessary hospitalization expenses of [the decedent] and pay the reasonable expenses of the . . . property." *Id.* ¶ 4 (omission, alteration, and internal quotation marks omitted). The court "later granted Ghoulson the additional authority to sell any real estate interest owned by [the decedent] with all sums in excess of the monthly requirements to be placed in a guardianship and trust account." *Id.* ¶ 4 (internal quotation marks omitted). At issue was Ghoulson's conduct in exercising her authority as " 'guardian' of her mother's estate" to sell real property and to "invest her mother's money, collect her social security payments, collect the royalties under the oil and gas leases, collect on grazing leases, acquire certificates of deposit with her mother's money, sell personal property owned by her mother, employ attorneys on her mother's behalf, employ persons to prepare income tax returns for her mother and submit the returns, and enter into oil, gas and grazing leases for the [real] property on her mother's behalf." *Id.* ¶ 5.

**{56}** The district court concluded that Ghoulson acted as a "conservator" within the meaning of Section 45-1-201(A)(5) when she sold the property the will had devised to petitioners and, therefore, petitioners were entitled to receive a general pecuniary devise equal to the net sale price of the property under a UPC statute providing that "if specifically devised property is sold by a conservator, the specific devisee has a right to a general pecuniary devise equal to the net sales price[.]" *In re Gardner*, 1992-NMCA-122, ¶ 19 (omission, alteration, internal quotation marks, and citation omitted). Ghoulson argued that the UPC statute upon which petitioners relied did not apply to "guardians" but only to "conservators" and that Ghoulson could not be considered a conservator "[b]ecause the order granting her authority to manage her mother's estate used the term 'guardian,' " and "if the district court had intended to make her a conservator, it would have done so." *Id.* ¶ 19. This Court concluded that, "despite the use of the word 'guardian' in the court order appointing Ghoulson as caretaker of her mother's estate, Ghoulson indeed acted as a conservator when she sold" the property devised to petitioners. *Id.* ¶ 22. The Court explained:

> A guardian has only care, custody, or control of the person. [NMSA 1978, § 45-1-201(A)(15) [(1989, amended 2011)]; *see also* Richard W. Effland, *Caring for the Elderly Under the Uniform Probate Code*, 17 Ariz. L. Rev. 373, 377 (1975). *A guardian is not authorized to sell property, enter into leases, or employ accountants and attorneys. See* § 45-5-312 (discussing powers of guardian). A conservator, on the other hand, is defined as "a

person who is appointed by a court to manage the property or financial affairs or both of an incapacitated person or minor ward." [Section] 45-1-201(A)(5). A conservator is authorized to generally manage all aspects of the incapacitated person's estate, including operating any business, investing funds, buying and selling property, *and employing accountants and attorneys.* [Section] 45-5-424.

Ghoulson does not challenge the district court's findings that she was named "guardian" of her mother's estate after her mother was adjudicated incompetent, that she was granted the authority to manage her mother's property and finances, and that in fact she did so by taking such actions as selling property, filing tax returns, collecting royalties and rental income, and entering into mineral and grazing leases on her mother's behalf. Thus, we conclude that, although the term "guardian" was used, Ghoulson actually acted as conservator of her mother's estate while her mother was incapacitated. To conclude otherwise would be to ignore the substance of what in fact occurred.

*In re Gardner*, 1992-NMCA-122, ¶¶ 23-24 (emphasis added).

**{57}** Conservator relies on *Gardner* in arguing that "[u]nder New Mexico law, hiring an attorney is a power reserved to the conservator and not to the guardian." But *Gardner* did not address the question whether a guardian may hire an attorney to represent an incapacitated person in a matter pertaining to her personal interests—whether the guardianship should continue—as distinct from a matter concerning the administration and disposition of her property, and so does not control the analysis here. *See Sangre de Cristo Dev. Corp. v. City of Santa Fe*, 1972-NMSC-076, ¶ 23, 84 N.M. 343, 503 P.2d 323 ("The general rule is that cases are not authority for propositions not considered."); *see also* § 45-5-424(C)(23) (enumerating tasks related to the management of estate assets as to which "[a] conservator, *acting reasonably in efforts to accomplish the purpose for which he was appointed*, may act without court authorization or confirmation," including to "employ persons, including attorneys, . . . to advise or assist him *in the performance of his administrative duties*" (emphasis added)).

**{58}** *Nelson* also is noteworthy for its emphasis on the authority of district courts to ensure that the exercise of guardianship and conservatorship authority is appropriate under the circumstances. 1994-NMCA-074, ¶¶ 20-21. The text of several statutes indicates legislative intent to confer on the district court the duty and authority to ensure the protection of the rights[17] and best interests[18] of incapacitated and other protected

---

[17] *See* § 45-5-307((D), (E), (H) (directing courts to follow statutory procedures "to safeguard the rights of the incapacitated person").

[18] *See* § 45-5-303(F) (discussing "alleged incapacitated person's best interest" in the context of the need for the court to determine whether "it is not in the alleged incapacitated person's best interest to be present" at the hearing "on the issues raised by the petition and any response to the petition"); § 45-5-313(B) (addressing "the best interests of the protected person" in the context of determining whether to retain jurisdiction or transfer proceedings); § 45-5-402.1(C) (stating court's authority to "exercise or direct the exercise of" certain powers "only

persons in Article 5 proceedings, and "in accordance with the values of the incapacitated person, if known[.]"[19] The need for and importance of court supervision in guardianship and conservatorship proceedings cannot be overstated, including oversight concerning the conduct of attorneys appearing in such cases, whether or not they are appointed by the court. *See generally In re Stein*, 2008-NMSC-013, ¶¶ 1-19, 143 N.M. 462, 177 P.3d 513 (per curiam) (Supreme Court decision in disciplinary case discussing attorney's conduct in proceeding seeking appointment of a guardian and conservator for an incapacitated person); *Clinesmith v. Temmerman*, 2013-NMCA-024, ¶¶ 23-24, 298 P.3d 458 (explaining that "the goal of a conservatorship is to protect the person and property of persons whose functional and decision-making capacity has become impaired" and that conservatorship proceedings require judicial oversight (internal quotation marks and citation omitted)); *see also In re Guardianship of Sleeth*, 244 P.3d 1169, 1175 (Ariz. Ct. App. 2010) ("[J]udges play a vital role in fulfilling the legislature's intent to safeguard those in need of the protection of conservators and guardians."); *cf. Chisholm*, 1997-NMCA-112, ¶¶ 12-13 (discussing district court's "duty to assure that the interests of a child are legally represented" and "broad authority to fashion its rulings in [the] best interests of the children[,]" which "includes the authority to disqualify a party's chosen counsel" based "solely on the best interests of the minor children[,]" without a finding that the attorney had a conflict of interest or violated any other rule of professional conduct" (citing *Sanders v. Rosenberg*, 1997-NMSC-002, ¶¶ 2, 4, 9-10, 122 N.M. 692, 930 P.2d 1144)).

**{59}** This case does not involve an attorney who acted without the district court's knowledge or in defiance of court orders. Richards' entry of appearance alerted the district court and everyone involved in the proceeding of his presence and proposed role; no one objected during the hearing conducted a week later that Richards' representation of C.G. was improper; and when Richards asked the court to clarify his role, the court responded with uncertainty. We recognize that Guardian's decision to retain Richards implicates the expenditure of estate funds. Nevertheless, the statutory text does not unambiguously evidence legislative intent to require, in cases involving both a guardian and conservator, that a guardian must obtain pre-approval by the conservator or the court of every measure a guardian deems necessary or appropriate in the exercise of her authority that may involve expenditures of estate funds. And we cannot read into Article 5 a requirement the Legislature did not include. *See, e.g.*, *Sec. Escrow Corp.*, 1988-NMCA-068, ¶ 7. Such a per se interpretation would mean that a guardian could not, for example, incur the costs of emergency medical treatment for an incapacitated person without pre-approval by the conservator or the court. *See Reule Sun Corp. v. Valles*, 2010-NMSC-004, ¶ 14, 147 N.M. 512, 226 P.3d 611 ("We will give effect to the legislative intent by adopting a construction which will not render the

---

if satisfied, after notice and hearing, that it is in the best interest of the protected person, and that the person either is incapable of consenting or has consented to the proposed exercise of power").

[19] *See* § 45-5-312(B)(3) (discussing exercise of guardian's power to make health-care decisions, stating that decisions concerning receipt or refusal of medical treatment "shall be made in accordance with the values of the incapacitated person, if known, or the best interests of the incapacitated person if the values are not known"); *see also Nelson*, 1994-NMCA-074, ¶ 17 ("When exercising the guardian's powers pursuant to the statute, the guardian is frequently required to recognize the primacy of the ward's values.").

statute's application absurd or unreasonable and will not lead to injustice or contradiction." (alteration, internal quotation marks, and citation omitted)).

**{60}** This case involves the following additional circumstance. While the record shows that the person who served as GAL in 2014 was among those notified that the district court set the January 21, 2016 hearing, no GAL was present at that hearing. And, by operation of law, no GAL was in place until the court re-appointed the former GAL at the end of the hearing because (1) the relevant statutes provide that "[u]nless otherwise ordered by the court," the duties of GAL "terminate and the [GAL] is discharged from" those duties "upon entry of the order" appointing a guardian or conservator and acceptance of those appointments, and (2) the 2014 Order stated that the duties of the GAL appointed in 2014 "terminated upon entry of this order." *See* § 45-5-303.1(B) (stating that, "[u]nless otherwise ordered by the court," GAL duties "terminate and the [GAL] is discharged from" those duties "upon entry of the order appointing the guardian and acceptance of the appointment by the guardian"); § 45-5-404.1(B) (same as to conservatorship proceedings).

**{61}** Accordingly—and regardless of whether the role of GAL is viewed as "arm of the court" (as the district court and Conservator described it) or as "advocate" or both (as Richards argued)—C.G. had no attorney when Guardian asked the court to consider whether C.G.'s guardianship continued to be necessary, when Daughter moved for removal and replacement of Guardian, and when the district court noticed the January 21, 2016 hearing, and would not have had an attorney to represent her at that hearing had Guardian not hired Richards to do so. *See In re Guardianship of Zaltman*, 843 N.E.2d 663, 668-69 (Mass. App. Ct. 2006) (discussing the "ultimate decision-making responsibility" of courts when "dealing with matters concerning a person properly under the court's protective jurisdiction," armed with inherent power "to act in the best interests of a person under its jurisdiction so as to afford whatever relief may be necessary to protect such person's interests"; stating that "[p]rocedural intricacies and technical niceties must yield to the need to know the actual values and preferences of the ward" (alteration, internal quotation marks, and citations omitted)). The purpose of the representation for which Guardian hired Richards related to C.G.'s person, not to her property. Although Richards' representation implicated the expenditure of estate assets, this does not establish that the issue requiring attorney representation was a matter within Conservator's exclusive authority.

**{62}** That it may have been prudent for Guardian to seek court approval of the contemplated representation, if for no other reason than that an attorney who performs work for a person under guardianship or conservatorship without having been appointed by the court, or otherwise obtaining assurance of payment, runs the risk of non-payment, *cf. In re Theodore T.*, 920 N.Y.S.2d 688, at *1 (N.Y. App. Div. 2011) (mem.) (applying New York law and explaining that "[a] guardian has the inherent authority to retain counsel" but that "a guardian who pays counsel fees without permission of the court does so at the risk of having the payments disallowed" (alteration, internal quotation marks, and citation omitted)), does not mandate a statutory construction contrary to ours. And we view the issue of payment of attorney fees as distinct from the

question of whether Guardian was authorized to hire an attorney to present and advocate for C.G.'s preferences, at least at the initial hearing.[20] That question is not before us, as the district court did not rule on that issue in the order appealed from. Nor did it rule that Richards' participation in the case was unnecessary after the appointment of a GAL, although Richards asked the court to clarify his role after the court re-appointed the GAL who had served in 2014. We therefore express no opinion on these matters. *See, e.g.*, *Batchelor*, 1965-NMSC-001, ¶ 6 (declining to review issue where the appellant failed to meet the burden "to show that the question presented for review was ruled upon by the [district] court"); *Luevano*, 1989-NMCA-061, ¶ 7 (stating, in declining to address issues, that "[a]n appellant has the burden of showing that a question presented for review on appeal was ruled upon by the [district] court").

**{63}** In sum, the order striking Richards' entry of appearance is based on the district court's conclusions that a court-appointed plenary (full) guardian has no authority to hire an attorney to represent a person adjudicated to be incapacitated in a subsequent Article 5 proceeding to determine whether guardianship continues to be necessary and that only a court-appointed conservator has such authority. Our rejection of the stated bases for the order before us fully resolves this appeal, making it unnecessary to address other arguments raised in the appellate briefing.

**{64}** We caution that our conclusion in this case is not and should not be interpreted as a broad rule. We do not suggest that a guardian may hire an attorney at any time, for any reason, or that an attorney hired by a guardian to represent an incapacitated person in an Article 5 proceeding must remain throughout the case and be paid from estate funds no matter the circumstances, or that persons participating in an Article 5 proceeding may not object and seek relief from the court, or that the court is disabled from removing an attorney for appropriate reasons. As discussed, Article 5 grants courts exclusive jurisdiction and authority to protect persons who are the subject of guardianship and conservatorship proceedings, including the ultimate authority—and duty—to ensure that actions taken by those involved in Article 5 proceedings serve the interests of incapacitated and other protected persons, circumstances that vary with each case. The circumstances in this case include a guardian whose views of what served the best interests of the incapacitated person diverged from those of family members; who had difficulties dealing with the conservator, a family member himself;

---

[20]Conservator repeatedly asserts that what he characterizes as the "pre-adjudication procedures" of Section 45-5-303 have no application in proceedings subsequent to the appointment of a guardian or conservator. The statutory text is to the contrary. Section 45-5-307(D) provides: "Unless waived by the court upon the filing of a petition to terminate a guardianship for reasons other than the death of the incapacitated person, the court shall follow the same procedures to safeguard the rights of the incapacitated person as those that apply to a petition for appointment of a guardian as set forth in Section 45-5-303." And Section 45-5-307(F) states: "Following receipt of a request for review, the court shall hold a status hearing, which may be informal, to determine the appropriate order to be entered. If the court finds the incapacitated person is capable of more autonomy than at the time of the original order, the court may enter an order removing the guardian, terminating the guardianship or reducing the powers previously granted to the guardian. The court has the option to follow all or part of the procedures that apply for the appointment of a guardian as set forth in Section 45-5-303." The record contains no indication that the district court waived or otherwise elected not to follow any procedures afforded by Section 45-5-303 in the 2016 proceeding.

and who believed it was necessary that the incapacitated person be represented by an attorney at a scheduled hearing precipitated by filings concerning whether the guardianship should continue. Richards' entry of appearance on behalf of C.G. alerted the district court and interested persons of his presence and intended role at a time when there was no GAL. When the court appointed a GAL at the January 21, 2016 hearing, Richards asked for clarification of his role and also asked (then and thereafter) to be appointed GAL. The district court did not clarify these matters immediately, but instead expressed uncertainty. And when Richards asked for reconsideration of the court's GAL appointment and for payment of his fees in a motion filed at the court's direction, the district court deferred consideration of that motion and subsequently left the Conservator's motion to strike undecided for almost two months.

**{65}** Caution is also warranted given that provisions of Article 5 have been amended following the events giving rise to this appeal, including by deletion of the following text from Section 45-5-312(B), upon which the analysis in *Nelson* and this opinion relies: "A guardian of an incapacitated person has the same powers, rights and duties respecting the incapacitated person that a parent has respecting an unemancipated minor child." Section 45-5-312(B) (2009, amended 2019). We express no opinion as to the impact of this (or any) amendment that became effective following entry of the order from which Richards appeals. *See Porter v. Robert Porter & Sons, Inc.*, 1961-NMSC-010, ¶ 18, 68 N.M. 97, 359 P.2d 134, ("[O]n appeal [the appellate courts] will not . . . decide questions that are abstract, hypothetical or moot[.]"); *Kysar v. BP Am. Prod. Co.*, 2012-NMCA-036, ¶ 21, 273 P.3d 867 ("Any attempt to undertake an analysis at this point would result in an advisory opinion, which we decline to give.").

**CONCLUSION**

**{66}** For the foregoing reasons, we reverse.

**{67}  IT IS SO ORDERED.**

**LINDA M. VANZI, Judge**

**WE CONCUR:**

**KRISTINA BOGARDUS, Judge**

**MEGAN P. DUFFY, Judge**